1. **AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANT**

2. I, Justin Phillips, being duly sworn, depose and state as follows:

3. I have worked as a Deputy for the Cass County Sheriff's Office in Fargo, ND since June 2017 and am a licensed Peace Officer in the State of North Dakota. I have been assigned as a Postal Inspector Task Force Officer (TFO) with the United States Postal Inspection Service (USPIS) since March 2023 and have completed a 24-hour USPIS orientation course in Denver, CO. I am currently assigned to a narcotics assignment, located at the Fargo, ND office of the Denver Division. As part of my duties as a U.S. Postal Inspector TFO, I investigate the use of the U.S. Mail to illegally send and receive controlled substances and drug trafficking instrumentalities. As part of this assignment, I received formal training from the USPIS and training through contact with experts from various law enforcement agencies. I have received training in the enforcement of laws, and the identification of packages with characteristics indicative of criminal activity. I have conducted and participated in criminal investigations utilizing the normal methods of investigation.

4. This affidavit is being submitted in support of an application for a search warrant to examine the following: **1.) Hernandez Broken iPhone, 2.) Hernandez Broken TCL Phone, 3.) Palacios Cricket Phone, 4.) Palacios Black iPhone, 5.) Duffle Bag Samsung Phone, 6.) Duffle Bag White iPhone, 7.) Duffle Bag Black iPhone and further detailed in Attachment A;** an electronic device, which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B. Your affiant seeks this warrant to obtain evidence of violations of Title 21 USC Sections 846 (conspiracy to distribute controlled substances).

5. As is described more fully throughout this affidavit, your Affiant submits there is probable cause to believe that individual(s) using these electronic devices, have and are, committing the above stated violations. Furthermore, there is probable cause to believe that evidence, fruits, and instrumentalities of these offenses (as described in Attachment B, Items to be Seized) will be found on these electronic devices.

6. The applied-for warrant would authorize the forensic examination of the devices for the purpose of identifying electronically stored data particularly described in Attachment B.

7. Because this affidavit is being submitted for the limited purposes of applying for a search warrant, I have not included each and every fact known concerning this investigation. It would be nearly impossible to include all known factual information in this affidavit. Instead, I have provided a general overview of the investigation and have set forth only the specific facts necessary to establish probable cause. Where statements of others are set forth in this affidavit, they are set forth in substance and are not verbatim. The information contained in this affidavit is based on my own personal knowledge and

information gained through training and experience, in addition to information obtained by other law enforcement agents, witnesses and documents.

8. Based on my training and experience, I use the following technical terms to convey the following meanings:

- Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

- Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

- Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

- GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another

location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

- PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

- Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

- Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

- IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP

addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

- Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

9. As further described in Attachment A, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the device because:

10. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

11. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

12. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

13. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

14. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

15. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

16. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

17. In or around October 2024, your affiant initiated an investigation into multiple individuals including Marco Antonio Hernandez, related to the distribution of controlled substances being distributed between North Dakota, Texas, and elsewhere. The investigation has resulted in the seizure of large amounts of methamphetamine, cocaine and other controlled substances. Controlled substances have been trafficked through the US Mail, commercial transportation systems, and other means. Through a review of USPS records, cell phone data, interviews of witnesses and co-conspirators, analysis of surveillance footage and financial records, and use of confidential informants and further investigation showed that one of the sources of supply of the controlled substances was identified as Hernandez who is from the Houston, TX area. Hernandez has an extensive controlled substances related criminal history, violent crime, and use of firearms and other weapons. The investigation revealed that Hernandez and other co-conspirators have previously utilized hotel rooms and Airbnb short term rentals to conduct drug trafficking activities.

18. Your affiant developed a registered confidential informant (CI) who has been in close communication with Hernandez and other co-conspirators and has direct knowledge about the ongoing drug conspiracy. Your affiant has found the informant to be reliable and credible. The CI has provided information that your affiant has relied upon and found to be true. The CI has provided information that has been found to be corroborated through multiple other methods to include text messages, surveillance, and other independent documents and records. The CI has participated in the ongoing drug conspiracy and is cooperating with law enforcement and providing information in exchange for consideration of his legal situation.

19. On March 25, 2025, CI informed you Affiant of Hernandez being in Fargo, ND, with a quantity of controlled substances. Your Affiant directed CI to communicate with Hernandez to purchase a quantity of methamphetamine from Hernandez. These communications were recorded and monitored at the direction and control of your affiant.

20. On March 26, 2025, at the direction and control of investigators, CI completed a video call with Hernandez, whereas Hernandez agreed to provide CI with two pounds of methamphetamine for $5,000.00 dollars. Hernandez directed the CI to pick up the methamphetamine where he is staying, which Hernandez provided as "By university", "1104 13th Ave n" (1104 13th Ave N Fargo, ND 58102 [SUBJECT PREMISES]. Hernandez reported to CI that he had obtained a two-bedroom Airbnb rental.

21. On March 26, 2025, investigators conducted a buy-walk controlled purchase from Hernandez using the CI. Prior to the CI departing the pre-determined meeting area, the CI completed an audio call with Hernandez and said he/she would be arriving at the SUBJECT PREMISES shortly. Upon CI arriving at SUBJECT PREMISES, CI was met

by a Hispanic male wearing a black shirt later identified as Hernandez outside of SUBJECT PREMISES. CI then followed Hernandez inside and into SUBJECT PREMISES, which was identified as "Unit 2" located within a multi-unit building. Investigators listened to the covert recording devices and overhead conversation between CI and Hernandez discussing the drug transaction.

22. On March 26, 2025, CI departed SUBJECT PREMISES with a brown paper bag. CI was followed back to the predetermined meeting area by investigators. The CI provided the brown paper bag containing two zip lock baggies to investigators, which was later weighed and field tested. The field test resulted in a positive alert for methamphetamine, weighing approximately 942 grams. Investigators conducted a detailed debriefing of the CI which is further detailed below and consistent with physical, audio, and aerial surveillance observations

23. During the debrief, the CI provided the following additional information in summary.
    - The CI was met outside of SUBJECT PREMISES by Hernandez. CI followed Hernandez inside where CI sat in the living room area. CI provided Hernandez with $5,000 in pre-recorded official buy funds. CI and Hernandez counted the money together to confirm the correct amount. After counting the money, Hernandez left the living room area, retreated to a location in the SUBJECT PREMISES outside of view of the CI, and returned carrying two zip lock style baggies containing the methamphetamine. Hernandez weighed the baggies on a digital scale to show CI the correct weight of 2 pounds. Hernandez said he had amounts of cocaine and "blues" (M30 Fentanyl Pills) which he had available for sale. CI was presented with a six-pack photo lineup. CI positively identified photograph #3 as "Kevin" who is a known alias name for Marco Hernandez, and said he was the individual he had met with for the controlled purchase.

24. On March 26, 2025, your Affiant applied for and received a federal search warrant, authorized by the Honorable U.S. Magistrate Judge Alice Senechal, to search the SUBJECT PREMISES. On the same date and due to the extensive criminal history and involvement with firearms, investigators requested the assistance of the Red River Valley Special Weapons and Tactics (SWAT) team to conduct the search warrant. At approximately, 7:05 PM, the search warrant was executed. Hernandez and another individual later identified as Eduardo Palacios, were ordered outside of the SUBJECT PREMISES. Hernandez was non-compliant to commands after exiting the SUBJECT PREMISES and was observed smashing/breaking cellular devices, identified as **Hernandez Broken iPhone and Hernandez Broken TCL Phone**. To gain compliance with Hernandez, SWAT utilized less than lethal munitions on Hernandez. Hernandez and Palacios were subsequently detained.

25. During the search of SUBJECT PREMISES, Investigators seized approximately nine (9) zip lock style baggies containing a white crystalline substance from one of the bedrooms [Bedroom G]. Investigators know from their training and experience to be consistent with methamphetamine. A sample of one of the baggies was field tested resulting in a positive alert for methamphetamine. Investigators also located varying amounts of a white

powdery substance later field tested resulting in a positive alert for cocaine, suspected M30 Fentanyl pills, and suspected black tar heroin from Bedroom G. Furthermore, a black duffle bag containing a large quantity of U.S. Currency was located in Bedroom G. Inside the duffle bag also contained three cellular phones identified as **Duffle Bag Samsung Phone, Duffle Bag White iPhone, Duffle Bag Black iPhone.** A review of the seized currency from the duffle bag contained several serial numbers coinciding with the pre-recorded buy fund numbers utilized for the controlled purchase between CI and Hernandez. Lastly, Investigators seized two firearms, identified as an AR style handgun loaded with .223 ammunition found unsecured next to the bed in Bedroom G, where most controlled substances were located. Located immediately next to the rifle was a loaded 9mm Smith and Wesson handgun on the nightstand next to the rifle.

26. During the search of Palacios' person, Investigators seized two cellular phones, identified as **Palacios Cricket Phone and Palacios Black iPhone.** A post Miranda interview and a consented phone review of **Palacios Cricket Phone and Palacios Black iPhone** were conducted by Investigators. The following is a summary of the interview and consented phone review.

    - Palacios lives in Houston, TX and was brought to Fargo, ND by Hernandez. Palacios came to Fargo, ND for work, where Palacios said to be a "labor place", or "office", noting Hernandez brought him to the area with the promise that he would make a lot of money, however, they had not started working yet after being in Fargo, ND for approximately one week. Hernandez told Palacios the labor place was close to the Airbnb. The black satchel that was on his person was his along with the U.S. Currency and **Palacios Cricket Phone and Palacios Black iPhone.** Palacious knew about the controlled substances in the residence, however, attributed them to Hernandez, expressing Hernandez did what he wanted to do. In relation to the controlled substances, Palacios said he would take Hernandez on rides around the area, at the direction of Hernandez. Hernandez would bring some of the zip-lock style clear plastics bags with them on the rides. When asked if the zip-lock style bags contained methamphetamine, Palacios stated he did not want to answer.
    - Palacios consented to the examination of **Palacios Cricket Phone and Palacios Black iPhone** and continued by providing the passcode. During the review of **Palacios Black iPhone,** Investigators noted messages and photos consistent with the distribution of controlled substances use and sales. During the review of **Palacios Cricket Phone,** photographs of Palacios holding the two seized firearms from Bedroom G, were located. Palacios confirmed with Investigators that to be him with the firearms, stating, Hernandez told him they were bringing the firearms with for their protection.

27. A post Miranda interview was conducted with Hernandez at the Cass County Jail by Investigators. The following is a summary of the interview and not of verbatim account. Hernandez was informed investigators located a large quantity of controlled substances, guns and money located at the SUBJECT PREMISES. Hernandez made tacit admissions to investigators that showed his knowledge and involvement in the distribution of

controlled substances. Hernandez told Investigators "But whatever the fuck y'all got going on up here, bro. It's been going on. It ain't never gonna stop, bro.".

28. With the information listed throughout the affidavit, your Affiant has reason to believe that the cell phones Hernandez destroyed **Hernandez Broken iPhone and Hernandez Broken TCL Phone**, will produce further evidence regarding the distribution of controlled substance. Investigators consulted with Bureau of Criminal Investigations (BCI) Special Agent (SA) Jesse Smith, who will attempt to reconstruct **Hernandez Broken iPhone and Hernandez Broken TCL Phone**. It is apparent from Hernandez's actions during the search warrant, Hernandez is attempting to prohibit Investigators from reviewing evidence held within **Hernandez Broken iPhone and Hernandez Broken TCL Phone**. Your Affiant has reason to believe that the three cell phones located in the black duffle bag, **Duffle Bag Samsung Phone, Duffle Bag White iPhone, Duffle Bag Black iPhone.** may produce further evidence regarding the distribution of controlled substances. As mentioned above also located within the black duffle bag with **Duffle Bag Samsung Phone, Duffle Bag White iPhone, Duffle Bag Black iPhone** was pre-recorded buy/fund money utilized to complete the controlled purchase of methamphetamine from Hernandez. Lastly, your Affiant has reason to believe based off of the post Miranda interview and consented phone review, that further evidence regarding the distribution of controlled substances would be identified throughout **Palacios Cricket Phone and Palacios Black iPhone,** that were located on the person of Palacios.

29. Your Affiant knows that individuals that electronically track packages commonly use computers, tablets, iPads, cell phones and other electronic devices to electronically track their packages. Your Affiant knows through his training and experience and conversations with other Law Enforcement personnel that individuals that utilized the U.S. Mail to traffic controlled substances and related will commonly obtain bulk amounts of free USPS shipping supplies in advance of drug shipments. These supplies may include shipping boxes and Priority Express Mail label. These labels have pre-printed tracking numbers and are available for customers to pick up in advance without interacting with a USPS employee. Individuals engaged in shipping controlled substances and proceeds through the US Mail, will obtain these items in advance so that they can prepare the shipping labels and packages in advance with additional privacy outside the present of USPS employees or other citizens. Commonly, these packages are prepared with various drug deterrent substances, and in this case spray foam was utilize, in an effort to evade detection by law enforcement. It would be nearly impossible and impracticable to obtain these shipping supplies and prepare the shipments during the same visit to a USPS facility.

30. Based upon my training and experience traffickers and persons involved in the manufacturing, distribution, and possession of controlled substances often possess firearms and other weapons, both legal and illegal, in order to protect their person, drugs, or the proceeds of drug transactions. Traffickers commonly maintain such firearms and

weapons where they have ready access to them, such as on their person, in their homes, and in their vehicles.

31. I am aware based on training and experience, and the experience of other law enforcement officers that cellular phones, especially smartphones, may contain photographs, videos, internet history, notes, call records, text and/or instant messages, call history, GPS/location, or other records that may indicate who was in control of the phone in questions. Photographs and videos obtained from a cellular phone may depict the clothing worn by the owner, other people the owner of the phone is associated with, and activities the owner of the phone is engaged with. Individuals involved in drug trafficking may take photographs or videos of contraband or proceeds related to the crime or maintain notes or other communications related to financial accounts or transactions associated with the crime. Cellular phones with GPS capability may retain a log where the phone was located at certain dates and times. Cellular phones with internet capabilities may also retain logs of websites visited and cached data that may indicate what information was retrieved over the internet.

32. Based upon my training, education, and experience in conducting narcotics investigations, your Affiant is also aware persons who traffic in controlled substances utilize cellular phones and other electronic devices to engage in drug trafficking activity, including through text messaging, social media, and phone calls. I am aware that cellular telephones and other electronic devices have various features that save information, data, and images on the device that are later accessible to the user. That information includes, but is not limited to, calls made, calls received, missed calls, text messages sent and received, contact lists, and photographic and video images. Some of this information can be maintained on media storage devices that may be inserted into the cellular phone or device.

33. Further, Your Affiant has participated in numerous investigations related to the distribution of controlled substances, wherein cellular phones have been utilized by these drug traffickers. During searches of cellular telephones seized from those individuals, the phones almost always have conversations in text messages and other messaging applications, such as "Facebook Messenger" and "WhatsApp," where users of the phone are arranging drug deals, and communicating with drug purchasers or sources of supply. Your Affiant has also observed numerous photos on such cellular phones where drug traffickers take photos and/or videos of themselves with large amounts of US Currency, of their drug products, and of firearms. Often times, these drug traffickers will send photos of their products to the people purchasing them. They will also often times request those who are laundering drug proceeds to send images of money wire transactions or receipts, or deposit record in financial institutions. Further, in most controlled purchase of drugs by law enforcement agents using confidential informants in recent years, cellular phones have been utilized to arrange meeting locations and meeting times, and to discuss drug weights, quantities, and/or prices.

34. I am aware based on training and experience, that individuals involved in trafficking controlled substances through the US Mail typically utilize Priority and Express Mail

Services due to their speed and reliability, as well as their ability to track the package's progress to its final destination. Your affiant is also aware that these drug traffickers typically utilize cell phones or other internet capable devices, to track the package through the USPS website and the 1-800 USPS telephone line. Furthermore, as indicated above, your affiant is aware that drug traffickers frequently communicate with each other via telephone and other electronic means such as text messaging.

35. Based on the above information, your affiant submits that probable cause exists to believe that evidence, fruits and/or instrumentalities of the above listed crimes, are present on the above detailed electronic devices. Your Affiant therefore requests that a search and seizure warrant be issued authorizing your affiant and other law enforcement to search these electronic devices for the items listed in the attached list of Items to Be Seized.

Respectfully submitted,

*Justin Phillips*
_____
JUSTIN PHILLIPS
U.S Inspection Service TFO

SWORN AND SUBSCRIBED TO BEFORE ME THIS ___7th___ DAY OF APRIL 2025.

_____
Honorable Alice Senechal
United States Magistrate Judge